We move to the sixth case this morning, Janusiak v. Cooper. There is one big issue in this case, the voluntariness of Janette Janusiak's statement. There are a handful of sub-arguments, all focused on the Ed Tutteth Merit Hurdle, and that of course focuses on the state court opinion. Each of those is distinct. Any one of them can overcome the hurdle, but they're all of a kind. They're all ways the Wisconsin Court of Appeals avoided actually examining the totality of the circumstances of the interrogation in this case. We're looking at a seven-hour interrogation of an eight-month pregnant woman who hadn't slept much, who was expressing anxiety about being separated from her four kids. She's in a small interrogation room with two and three officers at a time, insisting over and over and over that if she wants to get home to her kids, she has to change her story. At every turn, the Wisconsin Court of Appeals unreasonably interpreted Supreme Court law and misstated fact, allowing that court to avoid confronting these facts cumulatively. First, by unreasonably interpreting linum as irrelevant to any situation other than a quid pro quo threat to take one's children if they don't confess, the court rejected that statements about Jeanette being separated from her children were even really a factor in this case. By disregarding Miranda's discussion of the lack of any distinction between insisting on inculpatory statements or facially, at least, exculpatory statements, it rejected the officer's relentless pressures that she change her story, again, as a factor. By ignoring a long line of Supreme Court cases discussing the need to examine the totality of the circumstances cumulatively, not isolating each one, evaluating, rejecting, and moving on, the court was able to essentially say, well, pregnancy doesn't render a statement involuntary, so irrelevant, moving on. Threats about children that aren't a quid pro quo don't render involuntary, so again, irrelevant. There was no outward signs of exhaustion other than just one yawn, so the seven-hour interrogation, again, irrelevant. That's all from disregarding- How many breaks were there? I believe there were three, Your Honor, and only one was initiated by Jeanette, and that was really close to the beginning of the interrogation. Before anything got serious, the rest were initiated by officers. They were getting information throughout the interrogation from the hospital on what was going on with Peyton at this time. Ms. Mike, can I go back to one point you made? I think there's one aspect of what you said I very much agree with and another I'm not sure. Sure. Okay. I think you're absolutely right to characterize the transcript as evidencing a substantial and increasing amount of pressure on her to have changed her account, but you said early on that there were repeated statements made, if not threats, to remove her children from her. That's the part that I'm less sure about. I can think of a few references, but they do not seem on par with at least what we know about what occurred in Linum from the way the Supreme Court describes it. Can you comment on that? There's two different things. I mean, again, this is a long interrogation, and we're looking at all of these. The only part where there was discussion of removal of the children was the part where the social worker comes in at the officer's invitation, but after that, the officers repeatedly talked about her ability to be reunited with her children, so it wasn't a threat of we will take your children. When you say repeatedly, though, I mean, what do you have in mind, like three or four times or 15 or 20? I would say at least three or four. I believe I quoted most or all of the times in briefing, but certainly as the pressure got more intense, as her emotions were higher, there were more officers in the room. The interrogation had been going on for a longer period of time. They repeatedly bring up, you know, if you want to get home to your kids, for God's sake, help yourself here. And they're talking about being with her family, and the way that she could be with her family is by giving them a better explanation, by giving them a better story. And the Wisconsin Court of Appeals, you know, one of the things that we talk about being an unreasonable interpretation of the facts is the Wisconsin Appeals says, well, yes, they did make a promise that she could get back to her kids if she cooperated. But by cooperated, what they meant was give them a truly exculpatory statement that was consistent with all the medical evidence that they knew it, whereas, in fact, that's not at all what they said. I mean, we have quote upon quote upon quote, I mean, really from pretty early in the interview to when things got real tough, of them insisting that something must have happened between Jeanette and this baby, and it could have been an accident, it could have been a shampoo bottle, it could have been a shortfall, it could have been anything. They needed to give them something. And certainly, we know from testimony both at the involuntary dishearing and testimony at trial that, in fact, they didn't think there was anything in the world, she could medical evidence because the medical evidence as they were being told at each of these breaks that they were initiating was that she is the only person who could have killed this baby. And yet they continue to say over and over and over that if she wants to get home, she's got to change her story. So again, it's unreasonable for the Wisconsin Court of Appeals to interpret that to mean something other than what they were actually saying to Jeanette. It's like there are some factors that point the other direction, at least in the view of the state courts as I understand their decision. She was given her Miranda warnings. She accepted them. She chose to go forward and talk to the police anyway. Did she ever try to stop the interrogation? No. And in fact, I think it's remarkable that she clearly wanted to continue with the interrogation because they kept telling her, if you want to go home, we need a better explanation. Why doesn't that weigh, at least arguably in the state's favor, that this was not unduly pressured because they thought they were done and she wanted to keep talking? Again, it's all about the totality here. If you look at the idea of... Excuse me. Go ahead. If it's just that somebody, the officers say, well, now we can finish, and the person says, well, I have something more to say, that's one thing, but that's certainly not what we have here. We have her pleading, wailing, freaking out that she did not expect to be arrested for homicide and what she believed initially was just going to be a discussion of what had happened in her home the night before, and she wants to get out of there. She wants to get home to her kids. They then use that. They take that and they use it to get more statements from her, not confessing to a crime, but certainly they were used to very harmful effect at trial. Given the very difficult standard under the Anti-Terrorism and Effective Death Penalty Act, could you address our decision in DASI, which dealt with similar sorts of arguments, and could you identify what you think is the most compelling Supreme Court precedent that shows this application of the totality of circumstances was not just wrong, but unreasonable? Sure, Your Honor. In terms of DASI, this is a completely different interview from DASI. I mean, DASI talks about there weren't even raised voices. There was a lot of false friendship in DASI. This case doesn't involve much false friendship, at least not after hour three and a half, hour four, certainly hour five. These were three officers at many of the most heated parts in a small interrogation room hovering over an eight-month pregnant woman who's just been separated from her four young children, and again, over and over and over, saying, do you want to get out of here? Do you want to go home? You have to change your story, and telling her over and over the story they wanted to hear was something about an accident. They knew full well, never could have killed this baby, and so it involves a level of police coercion that just wasn't in DASI. And then in terms of the Supreme Court case, I mean, like I said, there's several different ways to get over the EDFA hurdle here. It's unusual in a 2254 case, but in terms of just misreading the totality of the circumstances of this test, I'll point to, I think it's Arvizu, which specifically, the Supreme Court is saying you can't evaluate and reject factors in isolation from each other without taking into account the totality of the circumstances. That's not what that phrase means. There's certainly that, but again, the fact that the Wisconsin Court of Appeals acted as if requests for a facially exculpatory statement was somehow not constitutionally significant is directly contradictory of Miranda, and there are other factual unreasonableness here. But I see that my time is up. Would I be able to have rebuttal? Sorry. Judge Kainey? I see my time is up. Would I be able to have more time for rebuttal, like one minute after? We'll see what counsel has to say. Thank you, Your Honor. May it please the Court, Assistant Attorney General Daniel O'Brien appears on behalf of the respondent, Appell Lee. State courts are given great leeway in assessing the general voluntariness standard regarding statements obtained under custodial interrogation when they balance the defendant's personal characteristics against the pressures brought to bear by custodial interrogation. The Wisconsin Court of Appeals, a fair amount of jurors could agree, reasonably balanced those personal characteristics against the pressures that were brought to bear in this situation. Even if this points in two different directions and another court might disagree, a fair amount of jurors could agree. In this case, the focus is primarily on Ms. Januziak's motherhood and her pregnancy. However, when balancing the personal characteristics, the courts sensibly pointed out that yes, she was eight months pregnant or seven months pregnant, I believe, but there were no signs that that affected her. She was given bathroom breaks. She never complained that she was in pain. She never complained about being hungry. She was offered food and soda. Mr. O'Brien, can I ask you a factual question? The question is this, what's the reason that Ms. Kopernol participated in the interview or the interrogation? What does the record show? Why she entered the room? My understanding, and I would have to, I guess I'm going to speculate a little bit, but I think it's based in fact, police have probable cause to arrest Ms. Januziak at that point. I'm asking more specifically what's in the record about it because what I thought was, is there anything at one of the breaks where Ms. Januziak, it may not have made its way to the record, where Ms. Januziak said, look, I wonder what's going on with my kids. I've been separated from my kids. I need to know what's going on with my kids. And the police department thought, well, let's get someone from child protective services in here. And I think, again, based on what the discussion was, and if you look at the transcript, the discussion goes on for about 10 minutes and she's talking about the kids and I think it is to advise her, look, in essence, I know you're concerned about the children. I've spoken with them. I'm not taking them into custody now. I think she is trying to reassure her and yet she's saying, all right, but you need to cooperate just to be, it's in your interest not to confess, but to be cooperative so we can get this resolved, I think is really the bottom line. Okay, fair enough. So let's suppose that that's right. How do you address Ms. Fite's point that you can't view that in isolation from what occurred later? In particular, when Tim Becker, the chief of police, if I'm not mistaken, entered the room, it's pretty clear that the temperature went up and the pressure dialed up pretty substantially. You can see that from the transcript and you can absolutely see it from the video. And it was Mr. Becker, or Chief Becker, that said, we're talking about jail here. There's not going to be any kids, no family. Why can't we combine the two points that I've just mentioned and interpret all of that collectively as conveying a threat that the kids will be removed? Because that's going to happen regardless of how she answers, unless, again, as the court held, unless she gave a truly exculpatory account. And I think if you look at the totality of the interview, you see that they are exploring what happened here. At the beginning of the interview, they didn't know what happened because she wasn't forthcoming. At the end of the interview, they still didn't know what happened because she wasn't forthcoming. That was the, give us an explanation. Was there a terrible accident? Did someone else do this? What was the point of asking her for an accidental explanation when the police thought themselves that that was just impossible? No, I don't think that's correct. I don't think they thought it was impossible if she said, a television fell on the child and they go back and there's a television on the floor, that's an accidental explanation that could be true, it could be exculpatory. I don't think they were ruling out explanations, they were ruling out falling off the bed, which is something she brought up after she continued to deny, when she said, nothing happened to the child. All I know is I woke up and she was gurgling and I saw a diaper rash. And they would not believe that because the medical evidence was directly contrary to that. Was there a terrible accident? And then she says, well, she might have fallen off the bed. She fell off the couch before once and she might have fallen off the bed. No, that doesn't jive with what we know. And again, not only are they exploring possible accidents, they're exploring other suspects, they're talking about what other men were around, what about the mother, what about her boyfriends. If you go through the entirety, again, this all has to be taken in context. And she was pretty steadfast. She maintained that in essence she's not at fault for this, whether it's I didn't do anything or if I did something, it was clearly an accident, if she fell off the bed, if I dropped her on the bed and she fell, that this, under the totality of the circumstances, again, we're not talking about physical coercion, we're not talking about physical intimidation, we're talking about someone, and throughout, especially when she initially didn't even claim accident, just that I didn't do anything, the officers repeatedly said, well, then we're done here, we'll take you into custody. And even at that point, she knows she's not going home, and that's early in the interview. And so she's trying to come up with something, and she knows she can't, and I think it's in serious trouble, she's going to be arrested, she's not going home to her children, and that no one needs to threaten her with that, she knows that. And that's why she keeps talking when they keep telling her, look, we're not getting anywhere here, so, well, then, and then she's, all right, how about this? And so you, and I think the Court of Appeals was correct that she knew, and the officers conveyed to her that unless you came up with a truly exculpatory explanation, not falling off the bed, but if there was a serious accident, or if one of her children threw the child from a high stairway or something, that that might get her home, if not right then, soon. And that was reasonable, and that, yet she, in fact, they wouldn't believe her falling off the bed story, and she kept trying to come up with something that they would believe, not because she was coerced by improper police tactics, as opposed to normal interrogation techniques, not that she was threatened, she knew, and the police knew, everybody knew in this interview that she was going to be taken into custody, again, unless the slim possibility that she would, let's say, she said, all right, all right, my boyfriend did it, okay, well, then, let's go talk to him. There was nothing, and so to say that her will was overborne under these circumstances, when she basically did not give police what they wanted from beginning to end, and finally was taken into custody, that this simply is not a line-of-situation, and again, she was told at the outset, you don't have to talk to us, you have the right to a lawyer, you have the right to remain silent, and she waived that right, which I think is the most distinguishing factor from Lynham, which was a 1963 pre-Miranda decision, and where the person was specifically threatened with losing her children unless she confessed, and here, we maintain that she was not threatened with losing her children, she was not going home that night, no matter what, and she stayed steadfast in her denial of intentionally hurting this child, and a denial of any knowledge of who, other than, okay, she fell off the and if she didn't want to give them anything, she wasn't going to give it to them, and the interview finally ended, and she was taken into custody, and the police really did not get what they wanted out of her, and we maintain that under the totality of the circumstances, again, in similar to this court's decision in Dassey, that this, a reasonable state court could find that this statement were voluntary under the totality of the circumstances. Thank you. Thank you, counsel. I'll give you a minute to remove. Thank you. I just want to correct a few things in the record. My opposing counsel says that it was early in the interview that she was told she was going into custody, it was about three and a half, four hours into the interview, and that's actually when things started getting increasingly, progressively more difficult, and there was some exploration of, was there anybody else there? Could there have been other suspects? That was at the beginning of the interview, in the friendly part of the interview, before the part that we have ever argued was involuntary. Certainly, once they had received a few of those breaks with the doctors, when we're past that three and a half, four hour mark, they weren't exploring other people. They weren't exploring whether a baby had been thrown from a building or a TV had dropped on it. They knew this baby had been sodomized, and they knew it had been killed, and the doctors were telling them it only could have been Jeanette, and she certainly was not the first person to bring up a fall off the bed. It was the officers repeatedly who raised that. Thank you. Can I ask one question, Judge Keeney? Sure. Ms. Feight, in your reply brief, you made clear that you're not arguing that the status of children is off limits. In an interview, and recognizing, of course, that every case like this is going to be heavily fact and circumstance dependent. Where do you think the line is, given all the depth and knowledge you have of the law in this area, about what the police can say and not say when talking to an individual in a violent crime situation who has children, and naturally and understandably is going to wonder about the children? Where is that line at, in your view? I think, unfortunately, it's impossible to define where that line is, because I think even the most extreme sentence I could come up with, you could imagine a context in which it might not have been meant the way it came out, or it would have been surrounded by other circumstances. So I think it's really the repeated discussion of getting home to her children by changing her story, combined with the social worker talking about potential removal of her children, and the fact even the county had looked at that before, combined with the length of time and with her expressing to the officers how much she needed to be with her children, and connecting all that to what she needed to do was to give them a new story and one that could be an accident. She never expressed any fear of losing custody, did she? She expressed great fear of being away from her children. But not losing custody? She didn't talk about that specifically, except when the social worker was telling her that she might lose custody. Toward the end, she starts sort of yelling, who's going to take care of my kids? I've got no one to take care of my kids. What's going to happen now? But she doesn't specifically discuss custody with the officers. I have to say I'm not really satisfied with your answer to Judge Scudder's question, because some of the readers of an opinion in this case will be lawyers for police departments who have to provide counsel about what they can and cannot do in interrogations. So I would ask you to try to be a little more specific, if you can, about what can be said about what will always be the case if a custodial parent is suspected of a violent crime. What I would say is they cannot use that to get the statement, to coerce the statement. So it's one thing to discuss kids in the context of an interview. They may come up. But to use the children in the context of insisting that a person give a particular kind of statement, a different statement, to keep talking, to change their story, I think you have to draw a line in using that. But again, I could imagine a very brief and friendly interview. Here we don't have a brief and friendly interview. We have a very antagonistic, very lengthy interview in which the officers are very clearly using her desire to be with her children to get her to change her story. Thank you. Thank you. Thanks to both counsel. The case is taken under advisement.